UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| TOM'S OF MAINE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civ. No. 07-73-P-S |
| | ) | |
| ACME-HARDESTY CO. and | ) | |
| OHMTEMP INTERNATIONAL, | ) | |
| INC., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ACME-HARDESTY CO., | ) | |
| | ) | |
| Third-Party Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AKZO NOBEL NV, *et al.*, | ) | |
| | ) | |
| Third-Party Defendants | ) | |

**MEMORANDUM OF DECISION ON
MOTIONS TO TAKE JURISDICTIONAL DISCOVERY**

Tom's of Maine brought this products liability action against Acme-Hardesty, a distributor that supplied Tom's with drums of capric acid, and Ohmtemp International, a manufacturer that supplied Tom's with one or more drum heaters. The action arises from a warehouse fire that occurred when Tom's used a drum heater to warm and liquidize capric acid contained in a drum having three small punctures in it. Tom's complains that the drum was defective because of the presence of the punctures and that the drum heater was defective because it should not have ignited the capric acid that leaked from the

punctured drum. The claim against Acme-Hardesty has occasioned a third-party action against a web of foreign entities, one of which manufactured the drum and one or more of which filled it with capric acid and handled it prior to its arrival in the United States. The foreign third-party defendants have filed motions to dismiss based on lack of personal jurisdiction. Acme-Hardesty has filed two motions requesting leave to conduct jurisdictional discovery. The Court referred the discovery motions to me and I now deny the motions.

**Jurisdictional Allegations**

The Amended Third-Party Complaint names 11 third-party defendants. There are five companies registered in Malaysia: Akzo Nobel Oleochemicals Sdn. Bhd. (currently known as "Pacific Oleochemicals Sdn. Bhd."); Akzo Nobel Industries Sdn. Bhd. (currently known as "Pacific Oleo Industries Sdn. Bhd."); Van Leer Malaysia Sdn. Bhd. (currently known as "Greif Malaysia Sdn. Bhd."); Van Leer Packaging Sdn. Bhd.; and Van Leer Packaging Sdn. Bhd. (East Coast) (currently known as "Greif Packaging (East Coast) Sdn. Bhd.").

Then there are two entities registered in the Netherlands: Akzo Nobel NV and Akzo Nobel Chemicals International BV.

Finally, there are four entities that Acme Hardesty refers to as foreign companies with a principal place of business in the United States: Akzo Nobel, Inc.; Akzo Nobel Chemicals, Inc.; Akzo Nobel Surface Chemistry, LLC; and Greif, Inc.

*The Akzo Nobel entities*

Acme-Hardesty alleges that the capric acid at issue in this case was manufactured and packaged by "Akzo Nobel" at facilities in Malaysia, namely Akzo Nobel

Oleochemicals (ANO) and/or Akzo Nobel Industries (ANI). (Am. Third-Party Compl. ¶ 8, Doc. No. 24.) Acme-Hardesty identifies these two Malaysian entities as the entities from which it purchased the capric acid. (Id. ¶ 9.) Acme-Hardesty then identifies the Dutch entity Akzo Nobel Chemicals International as a "successor in interest" to ANO and ANI "for all matters relevant to the case at hand, including any liability of [ANO or ANI] for the [fire]." (Id. ¶¶ 10 & 11.) The US entities are implicated, according to Acme-Hardesty, because "in the months leading up to [the fire] and the months following it, . . . [they] were involved in facilitating Akzo Nobel product shipments to customers in the United States, including [to] Acme-Hardesty."[1] (Id. ¶ 12.)

According to Acme-Hardesty, Akzo Nobel NV is engaged in distributing and selling capric acid to businesses throughout the United States. It is alleged that Akzo Nobel NV owns controlling interests in, and uses the Malaysian entities as, its manufacturing facilities. (Id. ¶¶ 18-25.)

Concerning the other Dutch Akzo Nobel entity, Akzo Nobel Chemicals International BV, Acme-Hardesty alleges it is a wholly owned subsidiary of Akzo Nobel NV engaged in the same activities anent capric acid and that it "contractually assumed responsibility for defense and handling of the alleged liabilities" of ANO and ANI, "including responsibility for defense and handling of Akzo Nobel's alleged liability with regard to the [fire]." (Id. ¶¶ 27-33.) According to Acme-Hardesty, "in written submissions filed with the U.S. SEC," Akzo Nobel NV has accepted joint and several liability for all of Akzo Nobel Chemicals International's contractual liabilities. (Id. ¶ 34.)

---

[1] This allegation is curious, because documentation related to the shipment from Malaysia indicates that the subject drum of capric acid was in Acme-Hardesty's possession as much as a year prior to the fire.

3

Concerning the U.S. Akzo Nobel entities, it is alleged that the Dutch parent Akzo Nobel NV owns 100% of Akzo Nobel, Inc., Akzo Nobel Chemicals, Inc., and Akzo Nobel Surface Chemistry, LLC, which have their principal places of business in Chicago, Illinois. (Id. ¶¶ 35-38, 40-43, 45-48.) Acme-Hardesty alleges that these entities were similarly engaged in distributing and selling capric acid to businesses throughout the United States, including to Tom's. (Id. ¶¶ 39, 44, 49, 70.)

According to Acme-Hardesty, "Akzo Nobel serves customers around the world with human and animal healthcare products, coatings and chemicals," and employs 62,000 people worldwide. (Id. ¶¶ 72,74.) It is alleged that Akzo Nobel "reports consolidated revenues and financial information for all of its business units/subsidiaries." (Id. ¶ 75.) Acme-Hardesty alleges that the sale of Akzo Nobel products in the United States arises from purposeful efforts of all of the Akzo Nobel defendants, and their U.S. distributors, "to serve directly and indirectly the market for Akzo Nobel manufactured products throughout the United States, including the State of Maine." (Id. ¶ 77.) Akzo Nobel is alleged to have an "expectation" and an "intention" that its products will reach consumers in the national market, including consumers located in Maine. (Id. ¶¶ 78-80, 82-84.) To achieve this end, Akzo Nobel uses other U.S.-based distributors in addition to Acme-Hardesty, but no allegations are offered concerning their principle places of business. (Id. ¶ 81.) According to Acme-Hardesty, capric acid supplied by Akzo Nobel to Acme-Hardesty was routed through Akzo Nobel warehouses in Illinois to Acme-Hardesty's location. (Id. ¶ 87.) Finally, it is generally alleged that Akzo Nobel conducts business in Maine, owned or leased (past tense) property in Maine, advertises in Maine, employs marketing representatives to directly target Maine customers, and "channels"

4

communications into Maine related to its products. (Id. ¶¶ 88-91.) The use of the label "Akzo Nobel" throughout the complaint appears to be a rhetorical technique to blur the fact that each of the Akzo Nobel entities is a distinct legal entity.

*The drum*

As concerns the drum, Acme-Hardesty alleges that it, too, was manufactured in Malaysia, albeit at a facility owned by one of the Van Leer entities. (Id. ¶ 13.) Acme-Hardesty identifies Greif, Inc., as a successor in interest to those entities as concerns any liability they might have for the fire. (Id. ¶ 14.) According to the Third-Party Complaint, Greif owns all of the shares issued by Van Leer Malaysia Sdn. Bhd., Van Leer Packaging Sdn. Bhd. and Van Leer Packaging Sdn. Bhd. (East Coast), making them wholly-owned subsidiaries (id. ¶¶ 50-53, 55-58, 60-63), and all of these entities are engaged in the manufacture and distribution of packaging materials to businesses throughout the United States, including the drum used to package the capric acid sold by Acme Hardesty to Tom's (id. ¶¶ 54, 59, 64, 66). Finally, it is alleged that all of these entities engaged in marketing and sales related to their packaging products and that such marketing and some associated products have reached the State of Maine. (Id. ¶ 93.)

**Discussion**

Acme-Hardesty's effort to establish this Court's jurisdiction over the third-party defendants relies on specific jurisdiction rather than general. (Doc. No. 56 at 4; Doc. No. 57 at 5.) There are three standards that govern the specific jurisdiction contest: (1) the third-party defendants' forum contacts must give rise to or otherwise sufficiently relate to the claim; (2) those contacts must demonstrate a "purposeful availment" by the third-party defendants of the privileges and benefits of doing business in this forum; and

(3) an exercise of jurisdiction must not offend traditional notions of fair play and justice as measured by a collection of "gestalt factors." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999); Nowak v. Tak How Invs., 94 F.3d 708, 717 (1st Cir. 1996); Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995). The gestalt factors are:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Nowak, 94 F.3d at 717. The gestalt factors can be determinative of personal jurisdiction defenses raised by entities engaged in international trade whose products can reasonably be expected to enter into the stream of commerce in the United States, particularly when there is no reasonable cause to differentiate among the individual states in that regard. Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102 (1987); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98 (1980). It is the plaintiff's burden to prove that personal jurisdiction exists in a given forum. Sawtelle, 70 F.3d at 1387. The plaintiff may do this with a prima facie showing that satisfies the personal jurisdiction tests. In aid of this task, the Court accepts appropriate evidentiary proffers as true. Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002).

Acme-Hardesty would like leave to conduct discovery targeted at the jurisdictional challenge set forth in the underlying motions to dismiss. As this Court recently observed:

> The First Circuit has stated that "diligent plaintiff[s] who sue[] an out-of-state corporation and who make[] out a colorable case for the existence of

6

> in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense." In addition, Plaintiffs must have been diligent in preserving their rights to jurisdictional discovery, which includes "the obligation to present facts to the court which show why jurisdiction would be found if discovery were permitted."

Amburgey v. Atomic Ski USA, Inc., No. 06-CV-149-P-S, 2007 WL 1464380, *5, 2007 U.S. Dist. LEXIS 36424, *15 (D. Me. May 17, 2007) (quoting United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 625, 626 (1st Cir. 2001)). In summary, the Court must evaluate whether Acme-Hardesty has made a colorable case in support of this Court's exercise of jurisdictional discovery, taking into consideration the kind of discovery that Acme-Hardesty proposes and the likelihood that it would generate the kind of evidence needed to hale one of more of the third-party defendants into this jurisdiction.

It is important to note at the outset that this recommended decision does *not* address the question of whether or not this Court has jurisdiction over the third-party defendants. It concerns, exclusively, the question of whether Acme-Hardesty should be permitted to conduct discovery concerning the third-party defendants' jurisdictional contacts. I discuss the Akzo Nobel and Greif corporate families separately below.

**A.     The Akzo Nobel Entities**

As concerns the Akzo Nobel entities, Acme-Hardesty would like to conduct discovery into how well they observe corporate formalities in relation to their importation and distribution of foreign manufactured Akzo Nobel products sold to customers in the United States. (Doc. No. 57 at 9-10, 12.) I conclude that this undifferentiated request to conduct discovery concerning the corporate and managerial interconnections of all of these entities (so called "alter ego" discovery) would be exceedingly diversionary and

7

unproductive.[2]  I also reject the associated efforts to conduct discovery about the forum contacts of third-party defendants whom Acme-Hardesty fails utterly to relate to the subject drum of capric acid.  Rather than discussing all of the defendants in an undifferentiated mass, as Acme-Hardesty does, I break them down into the appropriate categories.

### 1. *The Dutch Akzo Nobel entities*

Acme-Hardesty has chosen the specific jurisdiction option, which primarily concerns forum contacts related to the particular drum of capric acid that made its way from Malaysia to Tom's facility in Maine via Acme-Hardesty's domestic distribution channels.  In this context I find Acme-Hardesty's effort to hale the Dutch parent entities into this Court to be particularly unproductive.  Acme-Hardesty talks loosely of "Akzo Nobel" and U.S.-based distribution networks concerning all manner of products made by all business entities affiliated with the Akzo Nobel family.  Yet, Acme-Hardesty invokes specific jurisdiction and the subject capric acid that came into this forum sprang from a Malaysian branch of the family tree, not from its Dutch trunk.  Thus, as far as the Dutch entities are concerned, Acme-Hardesty fails even to demonstrate relatedness.  Moreover, even assuming that the placement of the capric acid into the stream of commerce was an act that could be attributed to the Dutch entities for purposes of demonstrating a claim-related forum contact, that showing would nonetheless fail to clear the purposeful

---

[2]  In discussions with counsel for the third-party defendants, counsel for Acme-Hardesty proposes six months of jurisdictional discovery in order to address all of the alter ego issues and overcome any potential delays occasioned by the language barrier.  (See Doc. No. 56-13.)

availment hurdle as applied by this Court in Amburgey, as discussed below with respect to the Malaysian entities.[3]

Acme-Hardesty informs the Court that Akzo Nobel maintains a website through which any potential Maine customer might order products directly from Akzo Nobel. (Doc. No. 57 at 12-14.) The reason why this revelation is being made in a motion for leave to conduct discovery is not entirely clear. Acme-Hardesty can already produce evidence concerning the website and there is no need to grant leave for associated discovery. Acme-Hardesty does not spell out any discovery request concerning the website and, as concerns the Dutch entities, Acme-Hardesty appears intent only upon conducting discovery about matters pertaining to corporate form and formalities.

Acme-Hardesty also asserts that Akzo Nobel has assigned the Tom's claim internally to Akzo Nobel Chemicals International BV. (Id. at 21.) It requests an opportunity "to uncover the written documentation that supports this representation, as well as . . . why liability was assigned to Akzo Nobel Chemicals International." (Id.) The materials cited by Acme-Hardesty reflect that this development occurred because Akzo Nobel Industries Sdn. Bhd. was acquired by a third party after the fire and that Tom's claim was retained in agreement with the insurer for either the Malaysian manufacturing divisions, the Dutch entities, or both. (Mawhinney Aff. ¶ 2, Doc. No. 57-4.) Acme-Hardesty propounds that the retention of the claim is some manner of ruse to avoid this forum, because Akzo Nobel Chemicals International is even more remote from this transaction than the Malaysian manufacturer, but I fail to see how discovery

---

[3] Acme-Hardesty says in a footnote that it would "like to explore" whether Akzo Nobel NV sold ADRs (American depositary receipts) to any Maine residents. I relegate that request to a footnote, too, because there is absolutely no analysis as to what difference this discovery would make as concerns the jurisdictional standard Acme-Hardesty has asked the Court to consider (specific jurisdiction).

9

concerning this accounting/insurance matter is likely to uncover any additional forum contacts that are likely to impinge upon the jurisdictional determination. Additionally, the suggestion of forum avoidance is not at all persuasive insofar as it concerns a shift from Malaysia to the Netherlands and the Malaysian entities challenge the Court's authority to exercise personal jurisdiction over them as well.

The request to conduct alter ego jurisdictional discovery about potential operational control by either Akzo Nobel NV or Akzo Nobel Chemicals International is not justified. The burden for piercing the corporate veil is exceedingly high, particularly in the context of claims arising out of contract,[4] and the discovery needed to satisfy that burden would be exceedingly broad and diversionary, without any apparent prospect of increasing the number and nature of any material contacts with the State of Maine as concerns the entities that actually made the capric acid and handled the drum containing it. Acme-Hardesty fails to make a colorable case for the allegation that the Dutch entities exercised control over the underlying transaction or the fulfillment of the order that brought the drum of capric acid to Tom's Maine facility and I conclude that shortcoming forecloses jurisdictional discovery against them.

### 2. *The Malaysian Akzo Nobel entities*

This Court held in <u>Amburgey</u> that the placement of a product in the stream of commerce, with awareness that it would likely reach this forum, is not enough to demonstrate an act purposefully directed at this forum. 2007 WL 1464380 at *3, *6, 2007 U.S. Dist. LEXIS 36424 at *10, *14. In <u>Amburgey</u>, the plaintiff sued an Austrian manufacturer of nationally distributed ski gear in a products liability action. The

---

[4] The domestic Akzo Nobel entities fairly and accurately describe the standards in their opposition brief. (Doc. No. 68 at 9-12.)

manufacturer sold its products to an affiliated domestic entity, which then distributed the products to dealers throughout the United States, specifically including Maine.  2007 WL 1464380 at *3, 2007 U.S. Dist. LEXIS at *10-*11.  Much the same obtains here.  What Acme-Hardesty alleges is that the Malaysian entity distributed the capric acid through a domestic affiliate situated in the United States, but outside of this forum, and that the capric acid eventually reached this forum by way of a dealer with definite forum contacts.  It is difficult to see how this case does not fit into the Amburgey mold.  In any event, the only discovery request that specifically targets the Malaysian entities is the one that seeks information about how and why Akzo Nobel Chemicals International BV assumed liability for any claim arising out of the Tom's incident.  I fail to see how, and Acme-Hardesty fails to articulate any plausible reason why, such discovery would tend to enhance Acme-Hardesty's ability to demonstrate forum contacts on the part of the Malaysian entities.

### 3. *The domestic Akzo Nobel entities*

Acme-Hardesty identifies three Akzo Nobel entities with a principal place of business in Chicago, Illinois:  Akzo Nobel, Inc.;  Akzo Nobel Chemicals, Inc.;  and Akzo Nobel Surface Chemistry, LLC.  According to the Amended Third-Party Complaint, the subject drum of capric acid traveled to Acme Hardesty via warehouse facilities in Illinois controlled by an Akzo Nobel entity.  (Am. Third-Party Compl. ¶ 87.)  In its motion for leave to conduct discovery, Acme-Hardesty asserts that Ms. Haidi Wang served as a domestic Akzo Nobel agent who directed oleochemical distribution traffic in the United States on behalf of the Akzo Nobel entities, including with specific reference to Acme-Hardesty's orders and shipments.  (Doc. No. 57 at 10-12.)  Acme-Hardesty reports that

Ms. Wang's business card identifies her as an employee of Akzo Nobel Surfactants, LLC, which is not named in the third-party action. (Id. at 11 n.5.) This promising start with respect to the domestic Akzo Nobel operations and their possible relationship to, or handling of, the product at issue in this case founders, however, when Acme-Hardesty describes the desired discovery as follows:

> It is believed that Acme-Hardesty will be able to demonstrate, with the use of Akzo Nobel's discovery responses, that Akzo Nobel utilized an extensive network of internal and external distribution contacts for the specific purpose of increasing its sale of Akzo Nobel manufactured product throughout the United States, including the State of Maine.

(Id. at 12.) In effect, Acme-Hardesty wants to discover all of the distribution networks in the United States that the domestic Akzo Nobel entities use or manage in order to deliver products to customers. (See also Doc. No. 71 at 5.) Presumably, the objective behind this request is to strengthen any showing concerning the foreseeability that one or more Akzo Nobel entity might be subjected to litigation in the Maine forum or the intensity with which the Akzo Nobel entities work to infiltrate our national markets. I conclude that this request also goes too far afield to be of use to the task at hand. In particular, the request seeks to extend discovery to domestic distribution channels having no relationship with this forum or with Tom's claims. As the label suggests, "specific jurisdiction" offers a rationale for haling a defendant into a forum in which that defendant does not reside based on the existence of claim-specific contacts. Taking time to conduct discovery about the third-party defendants' non-claim-related efforts to establish alternate or additional distribution networks that could include Maine within their reach simply does not advance matters appreciably, particularly as Acme-Hardesty is already in a position to establish that it is part of a network that has, in fact, resulted in the delivery of the subject drum of capric acid in Maine. Notably, Acme-Hardesty has not articulated

12

any discovery request to determine whether, in fact, the domestic Akzo Nobel entities were, in fact, part of the distribution network that actually handled this drum of capric acid.

Assuming that one or more of the domestic Akzo Nobel entities did participate in the shipment of the allegedly defective drum, that contact should either suffice or not suffice as a minimum contact in the specific jurisdiction context,[5] without any need for protracted discovery and fact finding about unrelated distribution networks or the subjective expectations of various personnel affiliated with the domestic entities. In World-Wide Volkswagen Corp. v. Woodson the Supreme Court stated that a forum "does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." 444 U.S. 286, 297-98 (1980) (holding that personal jurisdiction did not exist in a case where the retailer/distributor's market was limited to New York outlets and did not include any outlets in the forum). This *dictum* has been called into question by several jurists, including four Justices of the Asahi Court and, more significantly for present purposes, by Chief Judge Singal, to whom this case is assigned. Amburgey, 2007 WL 1464380 at *3, *6, 2007 U.S. Dist. LEXIS 36424 at *10, *14. In any event, even if a defendant's expectations were the sole criterion of the purposeful availment standard in a case involving a harmful defect in a product purposefully placed in the stream of domestic commerce, I am not persuaded jurisdictional discovery concerning a defendant's subjective expectations should be routine in these cases. Rather, reasonable expectations

---

[5] It would also demonstrate some relationship between this litigation and these entities. After all, unless they handled the drum it is difficult to understand how they could possibly be liable for the holes that someone allegedly drilled into the drum.

13

should be judged objectively, as a matter of law, based on the nature of the product, the market served, and the route by which the product reached the forum. Here, Acme-Hardesty does not seek to conduct any discovery about the actual stream that delivered the subject product. Instead, it wants to embark on discovery initiatives that would follow in the wake of other products traveling other channels or, worse, mire the litigation in protracted alter ego discovery. I decline to authorize that endeavor .[6]

**B.      The Greif/Van Leer Entities**

As concerns the Grief/Van Leer entities, Acme-Hardesty would like to conduct alter ego discovery similar to that proposed with regard to the Akzo Nobel entities. Acme-Hardesty and the Grief/Van Leer entities agree that the drum in question was manufactured by Van Leer Malaysia Sdn. Bhd. (now known as Grief Malaysia Sdn. Bhd.). There also does not appear to be any dispute concerning the fact that the drum was not shipped by Van Leer Malaysia to the United States, but was delivered to another Malaysian entity for purposes of packaging their product. The case for personal jurisdiction over a defendant based on such attenuated forum contacts is not colorable, at least not in the context of a third-party action. In <u>Asahi Metal</u> the entire Supreme Court agreed that it was against our notions of substantial justice and fair play to subject a Japanese component parts manufacturer to a claim for indemnification pressed by a Taiwanese manufacturer in a California court, at least where the Taiwanese manufacturer

---

[6]      Acme-Hardesty asserts that Akzo Nobel Chemicals Inc. has long-standing ties to Maine and has sold "millions of dollars worth of products in the State of Maine." (Doc. No. 57 at 23.) This sounds promising for Acme-Hardesty with respect to the underlying motion to dismiss by Akzo Nobel Chemicals, but there simply is no corresponding evidentiary assertion *or discovery request* that would tend to establish that Akzo Nobel Chemical Inc. controlled the transaction or handled the drum of capric acid that gave rise to this litigation. I conclude that that omission is significant because Acme-Hardesty states at the start of its motion that it is not attempting to establish—at least for purposes of the instant motion—general jurisdiction over the third-party defendants. In my view, this is merely an effort to attribute Akzo Nobel Chemical's non-claim-related contacts to every other Akzo Nobel entity by dint of the already foreclosed veil-piercing discovery initiative.

14

was itself subject to suit in that forum. 480 U.S. at 113-116. It is hard to distinguish that case from this one except for the fact that in this case the product changed hands one additional time because a United States distributor imported the goods and delivered them to this forum. Insofar as Acme-Hardesty is the party responsible for the arrival of the goods in this forum from Malaysia, it is hard to see why this Court should be more solicitous of its interest in its indemnification and contribution claims than the Supreme Court was of the claims pressed by the product manufacturer in Asahi Metal.

As for Grief, Inc., Van Leer Packaging Sdn. Bhd. and Van Leer Packaging Sdn. Bhd. (East Coast), Acme-Hardesty fails to depict a colorable case for personal jurisdiction based on an alter ego theory because all Acme-Hardesty offers is the mere fact of corporate affiliation. That is too slender a justification for side-tracking this litigation to address alter ego matters pertaining to a domestic parent and its Malaysian subsidiaries generally, when the claim-related contact runs narrowly to one Malaysian entity's provision of a 55-gallon drum to another, unaffiliated Malaysian entity.[7] Acme-Hardesty cautions that it would be an abuse of discretion to deny it the alter ego discovery it seeks, since it lacks any first-hand knowledge of the Greif/Van Leer entities. In my view, it would be one thing if Acme-Hardesty were proposing to conduct targeted

---

[7] Acme-Hardesty asserts that "[a] critical question in this litigation is whether Greif placed the holes in the drum," and that "[o]nly Greif can explain the factors that went into the design and manufacture of this [drum]." (Doc. No. 56 at 10.) These assertions puzzle me, because there does not appear to be any colorable basis for the assertions that Greif, Inc., ever had custody of the drum or that the presence of three drill holes in this particular drum has any relationship to the design or manufacture of Van Leer drums. Additionally, nowhere in its papers does Acme-Hardesty suggest that it needs discovery about whether or not Greif, Inc., Van Leer Packaging Sdn. Bhd., or Van Leer Packaging Sdn. Bhd. (East Coast) ever handled the drum. In this context, the only way I can interpret this statement is that Acme-Hardesty is simply referring to all of these affiliated entities when it uses the name "Greif," as opposed to "Greif, Inc.," just as it used the name "Akzo Nobel" in its other motion to refer to all of the Akzo Nobel entities as though they were actually one integrated entity. So, yes, it is a central issue who placed the holes in the drum, but the jurisdictional discovery motion targeting the Greif/Van Leer entities is not focused on that question at all, only on wide-ranging alter-ego discovery. This Memorandum of Decision obviously does not foreclose claim-related discovery.

discovery focusing on the Malaysian drum manufacturer and its own contacts with this forum, but it does not propose to take that targeted approach. (See Doc. No. 56-13.) What is proposed, alter ego discovery based exclusively on corporate affiliation, extends well beyond what can fairly be regarded as pragmatic, reasonably targeted jurisdictional discovery in a case of this nature.

## Conclusion

For the reasons set forth above, Acme-Hardesty's motions to conduct so-called "limited" jurisdictional discovery (Doc. Nos. 56 & 57) are DENIED.

## CERTIFICATE

Any objections to this Memorandum of Decision shall be filed in accordance with Fed.R.Civ.P. 72.

*So Ordered.*
February 15, 2008              /s/ Margaret J. Kravchuk
                               U.S. Magistrate Judge